UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

JAMES BURRESS, on behalf of
himself and the putative          1:20-cv-15242
class,

             Plaintiffs,          **OPINION**

    v.

FREEDOM MORTGAGE CORPORATION,

          Defendant.

---

**APPEARANCES**:

DAVID J. DISABATO
LISA R. CONSIDINE
DiSABATO & CONSIDINE LLC
196 SANTIAGO AVENUE
RUTHERFORD, NEW JERSEY 07070

ROBERT W. MURPHY (admitted *pro hac vice*)
MURPHY LAW FIRM
1212 SE 2ND AVENUE
FORT LAUDERDALE, FLORIDA 33316

    *On behalf of Plaintiff*

MARK E. DUCKSTEIN
JOSHUA N. HOWLEY
SILLS CUMMIS & GROSS P.C.
ONE RIVERFRONT PLAZA
1037 RAYMOND BOULEVARD
NEWARK, NEW JERSEY 07102

    *On behalf of Defendant*

**HILLMAN**, District Judge

    Plaintiff, James Burress, on behalf of himself and a

putative class, claims that Defendant, Freedom Mortgage Company,

violated Section 1683(f) of the Truth in Lending Act ("TILA"),

15 U.S.C. § 1601, et seq., when it sent him mortgage statements with two conflicting amounts due on the same statement.[1] Presently before the Court is Defendant's motion for summary judgement on the basis that Plaintiff's TILA violation claim is barred by the applicable statute of limitations.  For the reasons expressed below, the Court will deny Defendant's motion.

<u>**BACKGROUND**</u>

On September 29, 2014, Defendant agreed to make a loan to Plaintiff in the principal amount of $58,400.00, which was secured by a mortgage recorded against Plaintiff's residence. Defendant sent Plaintiff monthly mortgage statements for payment due on the first of every month.

Beginning in March 2019 and through November 2019, Plaintiff's monthly statements began showing two different amounts as due.  The "amount due" printed at the top of the mortgage statement and explained in the body differed from the "amount due" written at the bottom.  For example, the March 2019 monthly statement listed "$407.36" in the top right but showed "$414.72" in the pre-serrated bottom section meant for detaching

---

[1] Plaintiff's original complaint asserted one count under the TILA.  Plaintiff filed an amended complaint on January 13, 2021, which added claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. (Counts Two and Three), and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 (Count Four). Counts Two, Three, and Four were dismissed by a consent order filed by the parties on June 30, 2021. (ECF No. 52.)

and mailing to Defendant.  Both amounts showed "04/01/2019" as the corresponding due date.  In the middle of the statement, in a section titled "Explanation of Amount Due," "$407.36" is listed twice, which Defendant calculated by combining "$102.82" for "Principal," "$197.44" for "Interest," and "$107.10" for "Escrow/Impound (for Taxes and/or Insurance)."  No details were provided for how Defendant arrived at the higher amount of "$414.72" printed at the statement's bottom.

Each statement from March to November 2019 contained mismatched amounts, and they did not replicate each other. While "$407.36" appeared in the top section of all the statements, the number printed in the pre-serrated bottom section varied every month.  The November 2019 monthly statement, upon which Plaintiff's TILA count is based, listed "$407.36" in the top right but showed "$417.60" in the pre-serrated bottom section meant for detaching and mailing to Defendant.  Both amounts showed "12/01/2019" as the corresponding due date.  In the middle of the statement, in a section titled "Explanation of Amount Due," "$407.36" is listed twice, which Defendant calculated by combining "$106.04" for "Principal," "$194.22" for "Interest," and "$107.10" for "Escrow/Impound (for Taxes and/or Insurance)."  Again, no details were provided for how Defendant arrived at the higher

3

amount of "$417.60" printed at the statement's bottom.  (ECF 9 at 18.)

On June 8, 2020, Plaintiff sent a letter to Defendant requesting an explanation for the inconsistent statements. Defendant responded via letter dated July 13, 2020, claiming that the amounts listed on the statements "did not match . . . because of uncollected escrow amounts" stemming from a "January 1[,] 2019 . . . escrow analysis . . . which resulted in a lower monthly payment."  (ECF No. 16, "Exhibit L.")

According to the Defendant, underpayments by Plaintiff in February and March triggered the initial mismatched statements. (Id.)  Defendant claims that recoupment of those underpayments over the next several months led to the subsequent inconsistencies.  (Id.)

Based on the statement dated "11/01/2019," which disclosed different amounts as due, Plaintiff filed suit against Defendant on October 30, 2020.  By sending the defective statement, Plaintiff claims Defendant violated 5 U.S.C. § 1638(f) of TILA, which requires lenders and servicers to provide customers with accurate periodic statements, and is reflected in the implementing Federal Reserve Board Regulation Z:  12 C.F.R. § 1026.41(c), which requires creditors or servicers to make periodic statements "clearly and conspicuously in writing . . . in a reasonably understandable form"; and § 1026.41(d), which

4

requires that the creditor or servicer must provide a disclosure
of the "amount due," including the payment due date, the amount
of any late payment fee, and the date upon which the fee will be
imposed if payment has not been received together with the
amount due.[2]  Plaintiff claims that the inconsistent mortgage
statements violate these provisions as the disclosure of
inconsistent figures for the "amount due" places homeowners such
as Plaintiff in the unenviable position of not knowing the
correct amount required to keep the mortgage current.

Plaintiff asserts that his suit is timely because TILA's
one-year statute of limitations attaches to each erroneous
statement.  Because Plaintiff filed the present suit on October
30, 2020, which was within one year of the receipt of a
violative statement on November 1, 2019, Plaintiff argues that
the Court should allow the suit to proceed.

Defendant acknowledges sending Plaintiff mismatched
statements but contends that the statute of limitations expired
in March 2020, one year from Plaintiff's receipt of the first
defective statement in March 2019.  Defendant argues that
because Plaintiff was on actual notice of the discrepancy in
March 2019, the statute of limitations was not refreshed by the

---

[2] Under § 1026.41, the contents of the period statement for a
mortgage are very detailed and specific.  See 12 C.F.R. §
1026.41(d) (Periodic statements for residential mortgage loans).

5

issuance of each successive statement.  Defendant argues that
Plaintiff's TILA must therefore be dismissed.

## DISCUSSION

### A.    Subject matter jurisdiction

 This Court has jurisdiction over Plaintiff's federal claim
under 28 U.S.C. § 1331.

### B.    Summary Judgment Standard

Summary judgment is appropriate where the Court is
satisfied that the materials in the record, including
depositions, documents, electronically stored information,
affidavits or declarations, stipulations, admissions, or
interrogatory answers, demonstrate that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law.  Celotex Corp. v.
Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  Id.  In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and

6

all justifiable inferences are to be drawn in his favor."
Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir.
2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has
met this burden, the nonmoving party must identify, by
affidavits or otherwise, specific facts showing that there is a
genuine issue for trial.  Id.  Thus, to withstand a properly
supported motion for summary judgment, the nonmoving party must
identify specific facts and affirmative evidence that contradict
those offered by the moving party.  Anderson, 477 U.S. at 256-
57.  A party opposing summary judgment must do more than just
rest upon mere allegations, general denials, or vague
statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001).

   C.   Analysis

   TILA limits the time a person aggrieved under the Act may
file suit.  TILA provides, "any action under this section may be
brought . . . within one year from the date of the occurrence of
the violation."  15 U.S.C. § 1640(e).  The present case requires
the Court to decide whether an "occurrence" in the context of
the facts of this transaction means only the first alleged
violation in a series, or if each violative instance in that

7

series is considered its own "occurrence."[3]  That determination
is dispositive of the issue of when the one-year statute of
limitations begins to run.

The parties present competing theories for applying 15
U.S.C. § 1640(e) to the facts of this case.  Defendant argues
that the statute of limitations begins at the initial alleged
defective statement sent to Plaintiff.  According to Defendant,
the statute of limitations does not refresh with any subsequent
violations in the series because Plaintiff was on actual notice
of a TILA violation upon receiving the initial problematic
statement.  Therefore, Defendant contends that Plaintiff's
complaint filed on October 30, 2020, should be barred because it
was brought well beyond a year from the first defective
statement sent in March 2019.

Plaintiff argues the opposite position.  Plaintiff claims
that each defective statement represents a discrete violation of
TILA with its own one-year statute of limitations.  Thus,
Plaintiff contends that his complaint filed on October 30, 2020,
which was brought within one year from his receipt of the

---

[3] TILA 15 U.S.C. § 1640(g) only entitles a single recovery
regardless of whether multiple violations occurred.  In re
Wright, 133 B.R. 704, 710 (E.D. Pa. 1991) ("Although a single
violation of TILA gives rise to full liability for statutory
damages, 15 U.S.C. § 1640(a), multiple violations of TILA in the
course of a single loan do not yield multiple penalties but
result in only a single penalty.").

November 1, 2019 statement, adheres to TILA's statute of limitations.

To determine which interpretation is correct, the Court will first examine TILA's purpose.  Then the Court will consider how other courts have interpreted the term "occurrence" in TILA violation cases.

### I.    Purpose and Interpretation of TILA

TILA is a "federal consumer protection statute, intended to promote the informed use of credit by requiring certain uniform disclosures from creditors."  In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig., 418 F.3d 277, 303 (3d Cir. 2005); See also Beach v. Ocwen Fed. Bank, 523 U.S. 410, 412 (1998).  The legislation aims to "guard against the danger of unscrupulous lenders taking advantage of consumers through fraudulent or otherwise confusing practices."  Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 502 (3d Cir. 1998).  Because of the "remedial" nature of the Act, the Third Circuit "notes that TILA . . . should be construed liberally in favor of the consumer."  Id.; Slimm v. Bank of Am. Corp., No. CIV. 12-5846 NLH/JS, 2013 WL 1867035 (D.N.J. 2013).  This favorable interpretation applies specifically to the statute of limitations, which,

> is really a matter of balancing the interest of the
> creditor in properly limiting its exposure both to an
> initial suit and added damages, as provided under the Act

9

> versus the interest of the debtor in having the alleged
> non-compliance corrected and his resulting injuries
> remedied through compensation, as provided under the Act.
> Inasmuch as the TILA is a remedial act designed to protect
> the consumer, it seems obvious that it is the latter which
> should be afforded the greater weight.

Schmidt v. Citibank (S. Dakota) N.A. (CBSD), 677 F. Supp. 687,
690 (D. Conn. 1987).

## II.  Other TILA Rulings

In addressing whether an "occurrence" materializes only at
the first violation of TILA or if it refreshes with each serial
violation, the parties indicate that outcomes typically address
two issues: (1) the type of transaction (open versus closed);
and (2) the type of violation (failure to disclose/omission
versus an affirmative act).

### a. Open-End Transactions v. Closed-End Transactions

The term "open-end transaction" is defined in TILA as "a
plan under which the creditor reasonably contemplates repeated
transactions, which prescribes the terms of such transactions,
and which provides for a finance charge which may be computed
from time to time on the outstanding unpaid balance," such as a
credit card.  15 U.S.C. § 1602(i).  For an open-end transaction,
an "occurrence of a violation" is measured from either the
consummation of the transaction or when the first finance charge
is imposed.  Schwartz v. HSBC Bank USA, N.A., 160 F. Supp. 3d

666, 680 (S.D.N.Y. 2016) (quoting <u>Baskin v. G. Fox & Co.</u>, 550 F. Supp. 64, 67 (D. Conn. 1982)).

As for a "closed-end transaction," TILA does not specifically define the term, but courts construe it to mean a transaction where "the finance charge is divided into the term of the loan and incorporated into time payments," like a mortgage or car loan.  <u>McAnaney v. Astoria Fin. Corp.</u>, No. 04-CV-1101JFBWDW, 2008 WL 222524 at *4 (E.D.N.Y. Jan. 25, 2008). As opposed to open-end transactions, "[i]t is well-settled law that in 'closed-end credit' transactions . . . the date of the occurrence of violation is no later than the date the plaintiff enters the loan agreement or, possibly, when defendant performs by transmitting the funds to plaintiffs." <u>Cardiello v. The Money Store, Inc.</u>, No. 00 CIV. 7332 (NRB), 2001 WL 604007 at *3 (S.D.N.Y. June 1, 2001), <u>aff'd sub nom.</u> <u>Cardiello v. The Money Store</u>, 29 F. App'x 780 (2d Cir. 2002) (citing numerous sources).

Nothing within 15 U.S.C. § 1640(e) signals for separate treatment of the two types of loans.  <u>Goldman v. First Nat. Bank of Chicago</u>, 532 F.2d 10 (7th Cir. 1976) (Stevens, J., dissenting) ("[Section 1640(e)] imposes the same requirement in cases involving either type of transaction").  However, courts have held that that an "occurrence of a violation" is not typically interpreted the same way for an open-end transaction as it is for a closed-end transaction.  <u>Bartholomew v.</u>

<u>Northampton Nat. Bank of Easton, Easton, Pa.</u>, 584 F.2d 1288,
1296 (3d Cir. 1978); <u>Follman v. World Fin. Network Nat. Bank</u>,
971 F. Supp. 2d 298, 301 (E.D.N.Y. 2013) ("[T]he 'date of the
occurrence of the violation' can differ depending on the type of
consumer credit transaction at issue.").

Courts rationalize treating the statute of limitations
differently between the types of agreements because,

> In close end plans a determination of the charges is
> possible from the time of the first payment.  In open end
> plans with "free ride" periods, a finance charge may not
> appear until after many payments have been made.  Until a
> finance charge is levied the debtor has no cause for
> complaint since there has been no action inconsistent with
> the inaccurate disclosure.

<u>Goldman v. First Nat. Bank of Chicago</u>, 532 F.2d 10, 19 (7th Cir.
1976).

### b. Affirmative Acts v. Omissions/Non-disclosures

Another factor a court considers in determining when a TILA
violation has occurred for the purposes of the statute of
limitations is whether the defendant's alleged conduct
constituted an affirmative act or an omission.  An omission,
such as a disclosure violation, may "occur at the 'consummation'
of the transaction."  <u>In re Smith</u>, 737 F.2d 1549, 1552 (11th
Cir. 1984); <u>Herzog v. IndyMac Bank, FSB</u>, No. 11-4571, 2011 U.S.
Dist. LEXIS 130207, at *9-11, 2011 WL 5513205 (D.N.J. Nov. 9,
2011) ("If a lender fails to make one or more of the required
disclosures . . . such a claim . . . is subject to a one-year

statute of limitations, which begins to run when the underlying contract is executed.").  Or it may occur later in the transaction.  <u>See</u> <u>Schwartz</u>, 160 F. Supp. 3d at 680 (where an omission of a required disclosure appeared in the plaintiff's credit card statements received after the initial disclosures).

For a TILA violation in the form of an affirmative act, such an imposition of an improper finance charge, the statute of limitations typically runs from when the violative conduct occurs rather than when the parties enter into a transaction. <u>See</u> <u>Goldman v. First Nat. Bank of Chicago</u>, 532 F.2d 10, 20 (7th Cir. 1976) (explaining that affirmative violations are typically disconnected with the consummation of the agreement); <u>Partida v. Warren Buick, Inc.</u>, 454 F. Supp. 1366, 1371 (N.D. Ill. 1978) ("Nothing in . . . the Act mandates that there can be no violations of the Act after the transaction is consummated.").

### III. Whether the Statute of Limitations Runs from the March 2019 statement or Runs Anew from the Date of Each Statement

In this case, the transaction at issue concerns a mortgage, which would typically indicate that it is a close-end transaction because at the beginning of the loan, the finance charge is divided into the term of the loan and incorporated into monthly payments, all of which a mortgagee is aware at the time of contracting for 5, 10, 15, or 30 years.  In a typical case involving a close-end transaction, a § 1638(f) violation

for either an affirmative violation or an omission should
therefore be known at the inception of the transaction.  As
explained in the previous section, in this typical scenario, the
§ 1638(f) violation would constitute an "occurrence" on the date
of the first statement, if not even earlier on the date of the
consummation of the loan, which would trigger the one-year
statute of limitations as of that date, and not reset with each
subsequent statement.

    This case, however, does not fit neatly into the typical
scenario for a close-end transaction.  While the type of the
underlying transaction is a relevant factor, a court must also
look at the nature of the inaccuracy itself.  The alleged
inaccuracy in this case did not arise at the inception of the
mortgage in September 2014, but rather the first alleged §
1638(f) violation arose over four years later in March 2019.
Because the violation was not present when Plaintiff entered
into a transaction with Defendant, it cannot be held to have
occurred then.  In this way, the alleged § 1638(f) violation is
more like open-end transaction, where a debtor has no cause for
complaint until he realizes a problematic disclosure or improper
finance charge.  Thus, in this case, whether the mortgage is
considered a close-end or open-end transaction is an important
consideration, but it is not the key factor in the determination
of when the one-year statute of limitations begins to run.

Defendant appreciates this point, and argues that the Court should only consider its alleged first § 1638(f) violation in March 2019 and ignore each subsequent defective statement based on the "notice rule," which has been invoked in open-end transactions.  Based on the notice rule, Defendant argues that Plaintiff's complaint is barred by the TILA one-year statute of limitations because Plaintiff had actual notice of the allegedly TILA-violative statements more than one year before he filed the original complaint on October 30, 2020.  According to Defendant, once Plaintiff had actual notice of a TILA violation upon receiving the first defective statement in March 2019, the "notice rule" requires running the limitations period from that instance.  This is in contrast to Plaintiff's position that each violative statement triggers its own one-year statute of limitations period.

Defendant relies upon the rulings in Baskin and Schwartz as support.  Baskin v. G. Fox & Co., 550 F. Supp. 64 (D. Conn. 1982); Schwartz v. HSBC Bank United States N.A., 160 F. Supp. 3d 666 (S.D.N.Y. 2016).  In the context of an open-end transaction where a credit card servicer improperly compounded the finance charges in contradiction of the disclosure on the statement of how finance charges were to be calculated, the court in Baskin was tasked with deciding whether the statute of limitations ran from each serially committed affirmative finance charge or if it

15

was limited to only the first instance.  Baskin, 550 F. Supp. at
67.  The plaintiff there filed suit more than a year after the
first violation but within the statute of limitation for a
subsequent infirmity.  Id. at 65-66.  In barring the plaintiff's
suit, the Baskin court held that the statute of limitations
began to run when the plaintiff first discovered the erroneous
computation of the finance charge, and even though many
subsequent statements imposed the same improper finance charge,
his TILA violation claim was untimely because it had been more
than a year since he had discovered the violation.  Id. at 67.
Defendant argues that the same rationale should be applied here.

     Schwartz also concerned an open-end credit card
transaction, but it was with regard to the application of an APR
for late payments not disclosed on the billing statements.
Schwartz, 160 F. Supp. 3d at 680.  The court distinguished the
situation before it from Baskin because Baskin concerned the
improper imposition of finance charges, as opposed to the
omission of a required disclosure in each of the plaintiff's
credit card statements.  The Schwartz court denied the
defendant's motion to dismiss, where the defendant had argued
the plaintiff's TILA violation claim was time-barred because the
first instance of the alleged improper disclosures occurred in
November 2013, and the plaintiff did not assert his APR
disclosure claim until the filing of his first amended complaint

16

on March 27, 2015.  The court found that "in the context of a
creditor's failure to make disclosures required under TILA, the
statute of limitations runs from each instance of Defendant's
alleged failure to make a required disclosure.  Plaintiff's APR
disclosure claims are therefore timely in regards to the
disclosures contained in billing statements received during the
12-month period prior to his filing of the Amended Complaint."
Id. at 681.

      The court explained its reasoning, discussing Schmidt v.
Citibank (S. Dakota), N.A. (CBSD), 645 F. Supp. 214 (D. Conn.
1986).  Schmidt also concerned a defendant's argument that the
plaintiff's TILA violation suit for improper disclosures on a
credit card statement was untimely because the plaintiff first
received a periodic statement more than a year prior to the
complaint, even though the plaintiff had received allegedly
improper statements within a year of filing suit.  The court in
Schmidt recognized that periodic statements are required by 15
U.S.C. § 1637(b) for open-end credit arrangements, and that each
periodic statement constitutes a discrete and separate
"invitation" to accept credit.  Schmidt, 645 F. Supp. at 216.
"Creditors' continuing statutory duty to provide consumers the
information required by the Act creates an obligation to include
the required information in each monthly statement.  Failure to
do so is a fresh violation of the Act."  Id.  The Schmidt court

17

further opined, "Defendant's construction of the Act would

permit creditors, once the one-year period after the

commencement of a credit relation expires, to continue sending

improper statements to consumers with impunity rather than to

conform those statements to the Act's requirements.  Such a

result would be inconsistent with the spirit, if not the letter,

of truth-in-lending legislation."  Id.

The court in Schwartz followed that same reasoning:

> In the circumstance where the violation at issue is the
> creditor's affirmative act - specifically, an improperly
> levied charge - a consumer is reasonably on notice upon
> receiving a billing statement reflecting the improperly
> imposed charge.  Where, however, the violation consists of
> the creditor's omission of required information, a consumer
> cannot fairly to be said to have similar notice. . . .
> Placing the burden on consumers to recognize the *absence* of
> disclosures that are required precisely because consumers
> lack meaningful information about credit terms would
> directly contradict the intent of TILA.  Rather, in the
> context where the violation consists of a failure to
> disclose penalty rates, the statute of limitations period
> is more appropriately run from the time at which
> information was omitted from a required disclosure.

Schwartz, 160 F. Supp. 3d at 680.  The court in Schwartz denied

the defendant's motion to dismiss on the premise that each TILA-

violative statement which contained an inadequate disclosure had

its own one-year statute of limitations.[4]  Id.

---

[4] As noted above, where there are multiple alleged TILA
violations, a plaintiff is only entitled to a single recovery,
as long as the defendant which has violated the TILA does not
commit subsequent TILA violations.  Schmidt, 645 F. Supp. at 216
(quoting 15 U.S.C. § 1640(g)) ([T]he multiple failure to
disclose to any person information required under this chapter .

Despite the court's holding that the plaintiff's TILA claim could proceed, Defendant relies on Schwartz's statement that "where a creditor's affirmative act violates TILA, a notice rule for running the limitations period may reasonably be applied." Id. at 681 (citation and quotation omitted).  Defendant also distinguishes Schwartz from Plaintiff's claim here because Defendant construes Plaintiff's claim to be that of an affirmative act, rather than an omission in a disclosure.

Neither Baskin nor Schwartz supports the application of the "notice rule" as urged by Defendant in this case.  Baskin is distinguishable based on the nature of the transaction and the alleged § 1638(f) violation.  The Baskin court explained, "[W]hen a consumer applies for and is issued a credit card under an open end credit plan, there is no extension of credit from a lender to a potential borrower, because no debt has yet accrued. With the 'free ride' period permitted under most credit cards, it is only when the first finance charge is imposed that a consumer usually becomes aware that a violation of the Act has occurred.  This may be many months after the application for and issuance of the card."  Baskin, 550 F. Supp. at 67.  Thus, the court found, "Under these circumstances it appears evident that

---

. . shall entitle the person to a single recovery  . . . but continued failure to disclose after a recovery has been granted shall give rise to rights to additional recoveries.").

the purpose of the Act - to ensure the 'informed use of credit' - is best served if the starting point for the limitation period is deemed to be the date when there has been a finance charge which puts the consumer on notice that a violation has occurred."  Id.

This case does not present the same concerns expressed in Baskin with regard to "informed use of credit."  Here, the "amount due" on the monthly statements should have been known from the inception of the mortgage, as is typical in a close-end transaction, yet four years into the transaction, and for reasons unexplained on the statement, in alleged violation of 12 C.F.R. § 1026.41 ("Periodic statements for residential mortgage loans"), the "amount due" at the top of the statement differed from the "amount due" at the bottom of the statement.[5]

Additionally, unlike Baskin, this case does not concern a TILA violation in the form of an improperly imposed finance charge, which was charged each month from the inception of the credit card arrangement.  Here, two different amounts due began to appear on Plaintiff's statements four years after the loan's

---

[5] Further, in Baskin the plaintiff complained about the defendant's alleged violation of the TILA in a letter to defendant more than a year before filing suit.  Here, Plaintiff did not send a letter of inquiry to Defendant until June 8, 2020, which was four months before Plaintiff filed suit.

inception that were disconnected from any originating documents associated with Plaintiff's mortgage with Defendant.

Also dissimilar to the situation here, the TILA violation in Baskin was implemented in the same manner every month from the time a finance charge was imposed, which was over the course of several years.  In this case, a mismatch first appeared on Plaintiff's statement in March 2019.  A different mismatch appeared in April 2019, and then another different mismatch appeared in May 2019, and so on.  In each statement Defendant provided an allegedly "false or misleading" amount due in violation § 1638(f), and without any explanation in alleged violation of 12 C.F.R. § 1026.41, that did not appear to have any relation to the previous statement.

In other words, instead of the same mismatch appearing on every statement from the inception of the loan or even from March 2019 onward, starting in March 2019 Plaintiff was presented with differing amounts he was required to pay with no way to determine whether he should pay the top amount or the bottom amount, and with no way to determine whether the next month would contain the same or different mismatch.  Thus, Plaintiff only had "notice" of one mismatch at a time, rather than an initial notice of a TILA violation that repeated in the same manner thereafter which would support the application of the notice rule.

Moreover, the Court notes that the notice rule applied in

Baskin arose from a Seventh Circuit case as a way to save a

plaintiff's TILA violation claim, rather than to defeat it.  The

Baskin court explained the leading case for the application of

the notice rule was Goldman v. First Nat'l Bank of Chicago, 532

F.2d 10 (7the Cir.), cert. denied, 429 U.S. 870, (1976).  There,

> the plaintiff applied for, received, and used his
> BankAmericard for almost a year before he was assessed a
> finance charge for a late payment.  At that point, he
> noticed a discrepancy between the imposition of the finance
> charge and the method used for calculating the finance
> charge set forth in the disclosure statement received by
> the plaintiff at the time the card was issued.  Suit was
> commenced more than one year after the plaintiff received
> his credit card, but within a year of the time the
> violation came to plaintiff's attention.  The district
> court ruled that the action was time-barred.  The Court of
> Appeals for the Seventh Circuit reversed, holding that the
> statute did not run until the first finance charge was
> imposed.  The court stressed that its ruling depended on
> the unique nature of the open end credit plan where a
> determination of a violation of the Act is only possible
> when the consumer receives the first finance charge, which
> may be months after he receives and uses his credit card.

Baskin, 550 F. Supp. at 67 (citing Goldman, 532 F.2d at 22).

The Baskin court then distinguished Goldman from the case

before it:

> In the case *sub judice* the plaintiff admittedly perceived
> what he considered to be a violation of the Act more than
> one year before the commencement of the action.  He was
> fully cognizant of his rights under the Act by the spring
> of 1976, and thereafter spent several months arranging
> charges and payments with G. Fox in order to have his
> account reflect an even $100 for evidentiary purposes at
> trial.  These maneuvers have proved fatal to the
> plaintiff's cause of action.  On the basis of the statute

of limitations and relevant case law, it is clear that the plaintiff's action is barred.

Id.

The rationale for starting the one-year statute of limitations clock at the time when a credit card holder first notices that the finance charge has been improperly calculated and continues to be improperly calculated in the same manner thereafter month after month makes sense in that context. Where, however, a discrepancy of the amount due on a mortgage statement appears, especially when the amount due each month should be pre-determined at the outset of the mortgage and consistent on a single statement, and a different discrepancy appears on another statement, with no continuity of the differing amounts due and no disclosure explaining the discrepancy, it can only be found that each error is a separate "occurrence" of a TILA violation, and the mortgagee only had "notice" of a TILA violation at the time of each error.  The remedial purpose of the TILA, and the requirement that the TILA be interpreted liberally in favor of consumers, supports this conclusion.

Schwartz and Schmidt also support this finding.  Although Defendant unilaterally construes Plaintiff's TILA violation claim as an "affirmative act" akin to the improperly imposed finance charges in Baskin, Plaintiff's TILA violation claim

arises from alleged disclosure violations such as in Schwartz
and Schmidt.  TILA requires specific disclosures on periodic
statements for both credit relationships and for a residential
mortgage.  It was not until July 13, 2020 when Defendant
responded to Plaintiff's letter of inquiry that Defendant
explained the sudden appearance of mismatched amounts due on his
statements.[6]  As in Schwartz and Schmidt, Defendant allegedly
failed in its statutory duty, under 5 U.S.C. § 1638(f) and 12
C.F.R. §§ 1026.41(c) and 1026.41(d), to provide Plaintiff with
the explanatory information required by the TILA in each monthly
statement.  Every failure to do so constituted a fresh violation
of the Act.

        Thus, in this case, the one-year statute of limitations for
each of the allegedly TILA-violative statements started on the
day Plaintiff "noticed" the alleged TILA violation on each

---

[6] In that vein, if the notice rule were to apply here as it was
in Baskin, arguably the statute of limitations would not have
begun to run until Plaintiff received the requisite notice
required by the TILA on July 13, 2020 via Defendant's response
letter, because even though he previously recognized the
mismatched "amount due" on his statements, it was only then that
he discovered an alleged TILA violation in the form of deficient
disclosures on those statements.  This is in contrast to Baskin,
where the plaintiff knew the finance charge was improper from
the first instance but failed to take any legal action for over
a year.  The Court, however, aligns with Schwartz and Schmidt
and other similar cases in holding that each TILA-violative
periodic statement with improper disclosures has its own one-
year statute of limitations that runs from the date of each
statement.

statement.  For the November 1, 2019 statement, and using that date as the relevant date to start the clock, Plaintiff's October 30, 2020 complaint against Defendant for its alleged § 1638(f) TILA violation arising from that statement is timely. The evaluation of that claim may proceed on its merits.

<u>**CONCLUSION**</u>

For the reasons expressed above, Defendant's motion for summary judgement will be denied.  An appropriate Order will be entered.


Date: <u>September 3, 2021</u>          <u>  s/ Noel L. Hillman  </u>
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

Exhbit A - November 2019 statement (Docket No. 9 at 18.)



FOR RETURN SERVICE ONLY
PLEASE DO NOT SEND PAYMENTS TO THIS ADDRESS
P.O. BOX 619063
DALLAS, TX 75261-9063

**Mortgage Statement**
Statement Date 11/01/19

5-807-33641-0016881-002-000-010-000-000

| | |
|---|---|
| Phone: | 1-855-690-5900 |
| Customer Care: | Monday - Friday 8:00 a.m. - 10:00 p.m. ET |
| | Saturday 9:00 a.m. - 6:00 p.m. ET |
| Find us on the web at: | www.freedommortgage.com |

JAMES BURRESS
1990 WELLBOURNE DR NE APT 2
ATLANTA GA 30324-4954

| | |
|---|---|
| Loan Number | |
| Payment Due Date | 12/01/19 |

**Amount Due** | **$407.36**
If payment is received after 12/16/19, $15.01 late fee will be charged.
Property Address: 1990 WELLBOURNE DR NE 2
ATLANTA GA 30324

| | |
|---|---|
| Outstanding Principal | |
| Interest Rate | |
| Prepayment Penalty | |
| Escrow Balance | |
| Unapplied Funds | |

| | |
|---|---|
| Principal | $106.04 |
| Interest | $194.22 |
| Escrow/Impound (for Taxes and/or Insurance) | $107.10 |
| **Regular Monthly Payment** | **$407.36** |
| Total Fees & Charges | $.00 |
| Overdue Payment | $.00 |
| Unpaid Late Charges | $.00 |
| Other/Optional Products | $.00 |
| **Total Amount Due** | **$407.36** |

| Transaction Description | Date | Interest Paid To Date | Transaction Effective Date | Transaction Amount | Interest Paid | Principal Paid | Escrow Paid | Late Charges Paid | Fees Paid | Optional Insurance | Unapplied Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Payment | 10/04/19 | 10/01/19 | 10/04/19 | $204.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $204.00 |
| Payment | 10/18/19 | 11/01/19 | 10/18/19 | $204.00 | $194.63 | $105.63 | $107.74 | $0.00 | $0.00 | $0.00 | -$204.00 |
| Payment | 11/01/19 | 11/01/19 | 11/01/19 | $209.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $209.00 |

IMPORTANT NOTICE: TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED IN BANKRUPTCY, IS SUBJECT TO THE AUTOMATIC STAY OR IS PROVIDED FOR IN A CONFIRMED PLAN, THIS COMMUNICATION IS FOR REGULATORY COMPLIANCE AND/OR INFORMATIONAL PURPOSES ONLY, AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR SUCH OBLIGATION.

| | Paid Last Month | Paid Year to Date |
|---|---|---|
| Principal | $105.63 | $1,191.81 |
| Interest | $194.63 | $2,163.25 |
| Escrow (Taxes and Insurance) | $107.74 | $1,116.38 |
| Fees | $0.00 | $0.00 |
| Late Charges | $0.00 | $15.01 |
| Partial Payment Unapplied* | $209.00 | $209.00 |
| **Total** | **$617.00** | **$4,695.45** |

*Partial Payments: Any funds received that are less than a full periodic payment may be applied to your account, promptly returned to you, or held in a non-interest bearing account until enough funds are received to apply to a full periodic payment.

**Additional Monthly Amounts - This accounts for optional products including but not limited to: Total Protect.

**This balance represents the known Amount Due as of the printing of this statement. If you are delinquent, this balance may not represent full reinstatement of your obligation. Please contact us regarding your up-to-date reinstatement balance at 1-855-690-5900.

Additional information is provided on the back of the statement.

DETACH AND RETURN BOTTOM PORTION WITH YOUR PAYMENT

LOAN NUMBER:                    JAMES BURRESS

**Due By 12/01/19:**          **$417.60**

*$15.01 late fee will be charged after 12/16/19*

| | | |
|---|---|---|
| Additional Principal | $ | . |
| Additional Escrow | $ | . |
| Late Charge | $ | . |
| **Total Amount Enclosed** | $ | . |

Make check payable to Freedom Mortgage

FREEDOM MORTGAGE
P.O. BOX 7230
PASADENA CA  91109-7230

☐  To change mailing address and/or contact information, check here and complete form on back.